**Lino RODRIGUEZ, Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 25451.**

United States Court of Appeals,
Ninth Circuit.

Nov. 5, 1970.

Edward A. Infante, San Diego, Cal., for appellant.

Harry D. Steward, U. S. Atty., Kevin J. McInerney, Asst. U. S. Atty., San Diego, Cal., for appellee.

Before HAMLEY and KILKENNY, Circuit Judges, and BYRNE, District Judge.*

BYRNE, District Judge:

On September 16, 1969, Lino Rodriguez entered the United States from Mexico at the Port of Entry, San Ysidro, California, driving a 1960 Oldsmobile. Customs Agent McClain asked him "of what country are you a citizen?" The appellant, Rodriguez, replied that he was a citizen of the United States.

When the trunk of appellant's car was opened, McClain observed "an unexplainable space in there of about six inches that normally isn't in an automobile behind the rear seat". Further inspection revealed a man, later identified as Heliodoro Montes Acevedo.

Rodriguez was charged in count one with smuggling an alien in violation of Title 8 U.S.C. § 1324(a) (1); in count two with transporting an alien in violation of Title 8 U.S.C. § 1324(a) (2), and in count three with falsely representing himself to be a United States citizen, in violation of Title 18 U.S.C. § 911. The jury found him guilty on all three counts and the district judge sentenced him to the custody of the Attorney General for five years on count one, five years on count two, and three years on count three, the sentences to run concurrently.

Appellant specifies as error that the evidence was insufficient to support a finding of guilty to any of the three counts.

Rodriguez contends that his position with respect to the charge of falsely representing himself to be a United States citizen is supported by Smiley v. United States, 181 F.2d 505 (CA 9), and United States v. Anzalone, 197 F.2d 714 (CA 3).

Inspector McClain testified that the first question he asked the appellant was the country of his citizenship. In response to the question, the appellant stated he was a citizen of the United States.

The cases cited by the appellant are clearly distinguishable. In *Smiley* this court reversed a conviction for knowingly, wilfully and fraudulently representing United States citizenship when the appellant's sole act was to answer "Yes" to the word "Citizen" as it appeared on the identification report when he was booked following his arrest. The court stated the answer did not indicate that *Smiley* was falsely representing himself to be a citizen of the United States. In this case, the appellant clearly did. It should be noted that *Smiley's* conviction on another count was affirmed where *Smiley* had answered: "Yes" to the question, "United States citizen."

The position of the Third Circuit in *Anzalone* is also distinguishable from the facts of this case. In *Anzalone,* the court rejected the government's contention that

* Honorable William M. Byrne, United States Senior District Judge, Central District of California, sitting by designation.

signing a voter's certificate in Pennsylvania amounted to representation of United States citizenship. The court stated it " * * * represented only that he was the individual who had registered, that he had not removed from the voting district, and that he had not violated any Pennsylvania law prohibiting bribery".

There was ample evidence for the jury to find that the appellant acted wilfully when he asserted United States citizenship. It would be logical for him to believe that it might facilitate his entrance into this country. Indeed, this seems most plausible given his earlier conviction for illegal transportation of an alien. Here, he was driving a car without a registration slip or any papers showing ownership, and he had an alien hidden under the back seat.

Rodriguez does not dispute the fact that the alien was found in his car at the Port of Entry. With regard to the first two counts, the only question is whether he then knew the alien was concealed in his car.

In explanation of the presence of the alien in the car he was driving, the appellant stated he had brought his 1959 Pontiac to two men in Tijuana to have it repaired. The repairmen did not have a garage or repair shop, but worked out of a park. When he returned to pick up his car, he was told it was not ready. Instead, the two men furnished him with a loan car. They did not acquaint him with any address where he might communicate with them.

Rodriguez further testified that he recognized the car as the one owned by Jose Ramirez who stayed at the same address as appellant when he was in Tijuana. When he received the car, he drove to a nearby gas station where he conducted a search of the car's trunk, front seat and glove compartment. He stated he conducted the search in order to ensure against any marihuana being discovered when he crossed the border.

Also he acknowledged a prior conviction for transporting aliens, and he wanted to make sure that no such persons were in this car. However, he did not check the back seat. After the search, he filled the car with gas and drove to the border. He estimated that from the time he received the car until he stopped at the border, twenty-five to thirty minutes had elapsed.

The alien, Acevedo, testified that approximately ten days before his crossing into the United States he told two men in Tijuana that he wanted to come to the United States. The men arranged for him to meet a man named "Lupe," assuring Acevedo that "Lupe" could help him. After meeting Lupe he was told by this man that he could bring him across the border.

Acevedo's journey across the border began when he and Lupe traveled by bus to an isolated beach. At the beach, Lupe placed him under the back seat of a car parked at the beach and gave him instructions on how to get out of the car (there was no evidence as to how he would know when he reached his destination in Los Angeles). He was told not to make any noise and not to expect any assistance from the driver. Acevedo then paid Lupe $75.00 "because he put me in the car and he told me the car was going to Los Angeles". He stated he had never seen the appellant until they were taken into custody at the Port of Entry.

The witness also testified that once he was in the car, it drove away immediately. The automobile proceeded for about fifteen minutes when it made a five-minute stop. After this interruption the car proceeded for another ten or fifteen minutes when it stopped at the Port of Entry and he was discovered.

The evidence, although most of it was circumstantial, was substantial, and convinces us that it is sufficient to support the verdict.

Affirmed.